[No. S029736. Aug. 21, 1995.]

NADINE L. PETERSON et al., Petitioners, v.
THE SUPERIOR COURT OF RIVERSIDE COUNTY, Respondent;
BANQUE PARIBAS et al., Real Parties in Interest.

COUNSEL

McKay, Byrne & Graham, Gail D. Solo, John P. McKay, Esner, Marylander & Zakheim, Esner, Marylander, Zakheim & Higa, Billie Ann U. Higa and Stuart B. Esner for Petitioners.

Douglas Devries, Roland Wrinkle, Harvey R. Levine, Robert Steinberg, Thomas G. Stolpman, William D. Turley, Mary E. Alexander, Bruce Broillet, Wayne McClean, Leonard Sacks, Tony Tanke, Leonard Esquina, Steven J. Kleifield, David Rosen, Evan D. Marshall and Ian Herzog as Amici Curiae on behlaf of Petitioners.

No appearance for Respondent.

Haight, Brown & Bonesteel, Roy G. Weatherup, William O. Martin, Jr., Maureen Haight Gee, Sonnenschein, Nath & Rosenthal, Paul E. B. Glad, Thomas Holden, Cheryl L. Dyer and Michael A. Mathews for Real Parties in Interest.

Fred J. Hiestand, Lord Day & Lord, Barrett Smith, Banks Brown, Sullivan, Roche & Johnson, Robert M. Cassel and James R. Englese as Amici Curiae on behalf of Real Parties in Interest.

## OPINION

**GEORGE, J.**—In *Becker* v. *IRM Corp.* (1985) 38 Cal.3d 454 [213 Cal.Rptr. 213, 698 P.2d 116] (hereafter *Becker*), this court concluded that under California's products liability doctrine (which provides generally that manufacturers, retailers, and others in the marketing chain of a product are strictly liable in tort for personal injuries caused by a defective product), a residential landlord may be held strictly liable for an injury to its tenant caused by a defect in a leased dwelling. We granted review in the present case to decide whether *Becker* was wrongly decided and should be overruled, or, if *Becker* is not overruled, whether the principles underlying that decision apply outside the landlord-tenant context and warrant the imposition of strict products liability upon the proprietor of a hotel for an injury to its guest caused by a defect in the hotel premises.

■ Upon reexamining the basis for *Becker*'s holding with regard to the proper reach of the products liability doctrine, we conclude that we erred in *Becker* in applying the doctrine of strict products liability to a residential landlord that is not a part of the manufacturing or marketing enterprise of the allegedly defective product that caused the injury in question. For similar reasons, we also conclude that it would be improper to impose strict liability under products liability principles upon a hotel proprietor for injuries caused by an alleged defect in the hotel premises that the hotel proprietor did not create or market. Accordingly, we overrule that portion of our decision in *Becker* imposing strict products liability, and hold that neither landlords nor

hotel proprietors are strictly liable on a products liability theory for injuries to their respective tenants and guests caused by a defect in the premises. This conclusion, however, by no means absolves hotel proprietors or landlords of all potential responsibility for such injuries; on the contrary, hotel proprietors and landlords that breach the applicable standard of care still may be held liable under general tort principles for injuries resulting from defects in their premises. Additionally, the injured tenant or guest retains any strict products liability cause of action that may lie against the manufacturer, distributor, or retailer of a defective product that causes the injury.

## I

In an amended complaint filed March 19, 1990 (the last amended complaint), plaintiff Nadine L. Peterson alleged that, while a guest at the Palm Springs Marquis Hotel, she slipped and fell in the bathtub while taking a shower, sustaining serious head injuries.[1] Plaintiff alleged that the bottom surface of the bathtub was "extremely slick and slippery" and that the bathtub had no "safety measures" such as "anti-skid surfaces, grab rails, rubber mats, or the like." Plaintiff named as defendants, among others, the owners of the hotel, Banque Paribas and Palm Springs Marquis, Inc.; the operator of the hotel, Harbaugh Hotel Management Corporation; and the manufacturer of the bathtub, the Kohler Company. In addition to a cause of action for negligence, plaintiff brought a cause of action for "strict liability in tort," asserting the bathtub was a "defective product" because the bathtub "was so smooth, slippery, and slick as to have provided no friction or slip resistance whatsoever . . . ."

During discovery proceedings, the Kohler Company entered into a settlement with plaintiff for the sum of $600,000. The superior court found that this settlement was entered into in good faith.

Prior to trial, defendants Banque Paribas and Harbaugh Hotel Management Corporation (hereinafter defendants) filed a motion *in limine* to preclude plaintiff "from introducing any evidence or making any reference that strict liability applies to this case" on the ground that the *"Becker v. IRM*, (1985) 38 Cal.3d 454 [213 Cal.Rptr. 213, 698 P.2d 116], rationale does not apply to the present case . . . ." The parties did not submit evidence in support of—or in opposition to—this motion, and no evidentiary hearing was held. The trial court granted the motion, ruling as a matter of law that the decision in *Becker* did not apply to the owners and operators of a hotel.

---

[1] Plaintiff's husband, G. Eric Peterson, also brought causes of action for negligent infliction of emotional distress and loss of consortium. These causes of action are not at issue in the present proceedings.

A jury trial commenced that day but, on August 17, 1992, a mistrial was declared when the trial court excluded the testimony of plaintiff's expert witnesses for reasons unrelated to the issue before us.

Following a hearing, the trial court on October 3, 1992, issued an order that (among other things) confirmed that, upon retrial, the court would abide by its earlier ruling that "[s]trict liability as set forth in *Becker* v. *IRM*, 38 Cal.3d 454 [213 Cal.Rptr. 213, 698 P.2d 116], is not applicable to these proceedings." Plaintiff filed a petition for writ of mandate and/or prohibition in the Court of Appeal challenging the trial court's order, including the lower court's ruling precluding plaintiff from pursuing her strict products liability claim. The Court of Appeal summarily denied the petition for extraordinary writ. Plaintiff filed a petition for review in this court, which we granted, and we transferred the case to the Court of Appeal with directions to vacate its earlier order and issue an alternative writ.

After further proceedings, the Court of Appeal issued an opinion holding that a peremptory writ of mandate should issue directing the trial court, among other things, to permit plaintiff to proceed on her strict liability theory, and concluding that *Becker* applied to hotel proprietors. Upon petition by defendants, we again granted review to decide whether *Becker* should be overruled and, alternatively, whether under that decision the proprietor of a hotel is strictly liable in tort for injuries to guests caused by defects in the premises.[2]

## II

The sole issue in the case before us is whether the trial court erred in granting defendants' *in limine* motion to preclude plaintiff from arguing that, pursuant to our decision in *Becker*, the proprietor of a hotel is strictly liable under the doctrine of products liability for injuries to hotel guests caused by defects in the premises. For the reasons that follow, we conclude, upon reconsideration, that the decision in *Becker* constitutes an unwarranted extension of the doctrine of products liability and should be overruled. As we explain, the circumstance that landlords and hotel proprietors lease residential dwellings and rent hotel rooms to the public does not bring them within the class of persons who properly may be held strictly liable under the doctrine of products liability.

The plaintiff in *Becker* was injured when he fell against a shower door in the apartment he rented from the defendant. The door, which was made of

---

[2]Our grant of review did not encompass the other issue raised in defendants' petition, involving the applicability of the work product doctrine (Code Civ. Proc., § 2018) to the testimony of an expert witness employed by plaintiff.

untempered glass, broke and severely lacerated the plaintiff's arm. The only visible difference between shower doors with tempered glass and those with untempered glass in the apartment complex in question was a " 'very small mark in the corner of each piece of glass.' " (*Becker, supra,* 38 Cal.3d at p. 458.) The apartment was part of a 36-unit complex built more than 10 years before it was acquired by the defendant.

Relying upon the rule announced in *Greenman* v. *Yuba Power Products, Inc.* (1963) 59 Cal.2d 57 [27 Cal.Rptr. 697, 377 P.2d 897, 13 A.L.R.3d 1049] and its progeny, which imposed strict liability for personal injury caused by a defective product placed into the stream of commerce, this court observed that "a lease for a dwelling contains an implied warranty of habitability" and concluded that, in renting a dwelling, a landlord makes an "implied assurance of safety." (*Becker, supra,* 38 Cal.3d at pp. 462, 465.) Accordingly, this court held "that a landlord engaged in the business of leasing dwellings is strictly liable in tort for injuries resulting from a latent defect in the premises when the defect existed at the time the premises were let to the tenant. [Fn. omitted.]" (*Id.* at p. 464.)

The defendant in *Becker* argued that a landlord that purchases an existing building is not part of the manufacturing and marketing enterprise and, therefore, should not be held strictly liable in tort for injuries caused by defects in the premises. The defendant in that case argued that the reasons enumerated in *Vandermark* v. *Ford Motor Co.* (1964) 61 Cal.2d 256, 262-263 [37 Cal.Rptr. 896, 391 P.2d 168] for imposing strict liability upon the retailer of a defective product do not apply to landlords: "Strict liability on the manufacturer and retailer alike affords maximum protection to the injured plaintiff and works no injustice to defendants, for they can adjust the costs of such protection between them in the course of their continuing business relationship." The defendant observed that a subsequent purchaser of a rental property never was in a business relationship with the builder and does not have a continuing business relationship with the builder that would permit adjustment of the cost of protecting tenants. The defendant also likened the landlord that purchases a building that is not new, to a seller of used machinery—such a seller not being strictly liable in tort. (*Becker, supra,* 38 Cal.3d 454, 465.)

We rejected these arguments in *Becker,* concluding that "a continuing business relationship is not essential to imposition of strict liability." (*Becker, supra,* 38 Cal.3d at p. 466.) The court stated: "The paramount policy of the strict products liability rule remains the spreading throughout society of the cost of compensating otherwise defenseless victims of manufacturing defects. [Citations.]" (*Ibid.*) Strict liability was imposed, therefore, because

the court concluded "[t]he cost of protecting tenants is an appropriate cost of the enterprise." (*Ibid.*)

We further held in *Becker* that the superior court had erred in granting summary judgment for the defendant on the plaintiff's cause of action for negligence. Rejecting the defendant's contention that its lack of actual knowledge of the defect was dispositive, *Becker* held: "In the exercise of ordinary care, the purchaser of rental property may be expected to inspect the premises not only to determine whether they are aesthetically pleasing but also to determine whether they meet bare living standards, including whether they are safe. . . . Similarly, a landlord at time of letting may be expected to inspect an apartment to determine whether it is safe." (*Becker, supra,* 38 Cal.3d at p. 468.) We added, however: "The duty to inspect should charge the defendant only with those matters which would have been disclosed by a reasonable inspection." (*Id.* at p. 469.)

Then Associate Justice Lucas, joined by Justice Mosk, concurred in the majority's conclusion as to the issue of negligence—that "a landlord may be held liable for dangerous conditions of which he knew or should have known"—but dissented from the majority's holding with regard to strict liability. (*Becker, supra,* 38 Cal.3d at p. 479 (conc. and dis. opn. of Lucas, J.).) Terming the latter holding "an unprecedented leap," Justices Lucas and Mosk observed that "[a]ny landlord, even one renting the family home for a year, will now be insurer for defects in any wire, screw, latch, cabinet door, pipe or other article on and in his premises at the time they are let despite the fact that he neither installed the item nor had any knowledge or reason to know of the defect." (*Id.* at p. 479.) Justices Lucas and Mosk concluded they "would hold that a subsequent purchaser of property who has not installed, altered or created the item or condition which is claimed to be defective, and who has no actual or constructive knowledge of any defect therein, should not be held strictly liable. . . . [W]here the landlord has no continuing relationship with the chain of marketing leading back to the manufacturer of the defective product, and thus has no way of influencing the production or design of the product or of adjusting potential costs of the *manufacturer's* enterprise or others in the business of marketing the item at issue, imposition of strict liability is inappropriate." (*Id.* at p. 487, italics in original.)

The decision in *Becker* has received a chilly reception. The Court of Appeal in *Vaerst v. Tanzman* (1990) 222 Cal.App.3d 1535 [272 Cal.Rptr. 503] held that *Becker* did not apply if the tenant was injured by a patent defect in leased premises (an allegedly defectively designed handrail on a stairway) or if the landlord leased only his own family residence on a temporary basis. Concluding that *"Becker* must be limited to its facts" (*id.* at

p. 1541), the Court of Appeal stated in a footnote: "We note that *Becker* represents a minority view to which Chief Justice Lucas and Justice Mosk vigorously dissented. The overwhelming weight of outside authority consistently holds that the imposition of strict liability upon the landlord for latent defects in premises is unjustified in the absence of a showing that the landlord had notice or knowledge of the defect because the landlord is not an insurer of the property. [Citations.]" (*Id.* at p. 1541, fn. 2.)

The only other state, of which we are aware, to discuss the holding in *Becker* imposing strict liability upon landlords, adopted the contrary rule. (*Armstrong* v. *Cione* (1987) 69 Hawaii 176 [738 P.2d 79, 84].) The *Armstrong* case involved circumstances nearly identical to those in *Becker*; a tenant was injured by the breaking of a shower door made with untempered glass. The Supreme Court of Hawaii, citing with approval the *dissent* in *Becker*, held that strict products liability did not apply to the landlord.[3]

Many commentators have criticized the decision in *Becker*. (Comment, *California's Approach to Landlord Liability for Tenant Injuries: Strict Liability Reexamined* (1993) 26 U.C. Davis L.Rev. 367, 423 ["The California Supreme Court should . . . overrule *Becker* . . . ."]; Note, *A Bird in the Hand: California Imposes Strict Liability on Landlords in Becker* v. *IRM Corp.* (1987) 20 Loyola L.A. L.Rev. 323, 372-373 ["*Becker* represents a vast and unwarranted extension in the area of strict liability . . . ."]; Walker, *The Expanding Applicability of Strict Liability Principles: How is a 'Product' Defined?* (1986) 22 Tort & Ins. L.J. 1, 11; Note, *Let the Landlord Beware: California Imposes Strict Liability on Lessors of Rental Housing* (1986) 51 Mo. L.Rev. 899; Note, *Becker v. IRM Corporation: Strict Liability in Tort for Residential Landlords* (1986) 16 Golden Gate L.Rev. 349; Note, *Landlord-Tenant: Landlord's Strict Liability for Personal Injury Arising from Latent Defects in Premises—Becker v. IRM Corp., 38 Cal.3d 454, 698 P.2d 116, 213 Cal.Rptr. 213 (1985)* 1986 Ariz. St. L.J. 561, 582 ["The extension of strict liability to all landlords is inequitable."]; contra, Nolan & Ursin, *Strict Tort Liability of Landlords: Becker v. IRM Corp. in Context* (1986) 23 San Diego L.Rev. 125, 129 [describing *Becker* as "a desirable application of strict liability, supported by the decisions of the past two decades."]; Note, *Becker v. IRM Corporation: The Final Chapter in the Destruction of Landlord Tort Immunity* (1986) 17 Pacific L.J. 995, 1007 [neither criticizing nor endorsing *Becker*: "Whether the decision will have the effect of imposing 'an unusual and unjust burden on property owners' remains to be seen."].)

The decision in *Becker*, judicially engrafting products liability principles onto the law governing landlord liability and holding landlords strictly liable

---

[3]As discussed below, other courts have rejected the imposition of strict liability upon landlords without citing the decision in *Becker*.

for injuries caused by defects in leased premises, represents a minority view that does not appear to be gaining acceptance.[4] Louisiana long has imposed strict liability upon landlords pursuant to *statute. (Marcantel* v. *Karam* (La. Ct.App. 1992) 601 So.2d 1, 2.) Nearly 20 years ago, 2 New York courts adopted a strict liability rule (*Kaplan* v. *Coulston* (1976) 85 Misc.2d 745 [381 N.Y.S.2d 634, 638], cited with approval in *McBride* v. *218 E. 70th St. Associates* (1979) 102 Misc.2d 279 [425 N.Y.S.2d 910, 912]), but that state soon abandoned that approach in favor of a negligence standard. (*Alharb* v. *Sayegh* (1993)199 A.D.2d 229 [604 N.Y.S.2d 243, 244]; *Carpenter* v. *Smith* (1993) 191 A.D.2d 1036 [595 N.Y.S.2d 710]; *Segal* v. *Justice Court Mutual Housing Cooperative, Inc.* (1981) 108 Misc.2d 1074 [442 N.Y.S.2d 686], affg. *Segal* v. *Justice Court Mut. Housing Co-op.* (1980) 105 Misc.2d 453 [432 N.Y.S.2d 463, 466-467]; *Curry* v. *New York City Housing Authority* (1980) 77 A.D.2d 534 [430 N.Y.S.2d 305, 306-308] [dicta].)

New Jersey expressly has rejected the imposition of strict liability upon landlords. In *Dwyer* v. *Skyline Apartments, Inc.* (1973) 123 N.J.Super. 48 [301 A.2d 463], a tenant who had occupied an apartment in a multi-unit building for 15 years was burned when she turned on the hot water faucet in the bathtub in her apartment and the entire fixture came out of the wall, causing scalding water to gush from the pipe. The plaintiff described the faucet as "very corroded" but stated she had no idea of its condition prior to the accident, because the corrosion had been hidden inside the wall. The trial court found for the plaintiff, despite the absence of actual or constructive notice to the landlord of the defect, holding the landlord strictly liable based upon an implied warranty of habitability. The intermediate appellate court[5] reversed the judgment, stating: "Since his duty is not to insure the safety of tenants but only to exercise reasonable care, a landlord is liable only for injurious consequences to a tenant by reason of defects 'of which he has knowledge or of defects which have existed for so long a time that . . . he had both an opportunity to discover and to remedy.' [Citations.]" (301 A.2d at p. 465.) The court rejected the argument that the landlord could be held strictly liable on a products liability theory: "The underlying reasons for the enforcement of strict liability against the manufacturer, seller or lessor of

---

[4]"The California Supreme Court, analogizing to products liability decisions, has imposed a rule of strict liability upon residential landlords for harm caused by defects that existed at the time the premises were leased. [Citation.] . . . . *No other jurisdictions have followed California's lead.*" (Page, *Deforming Tort Reform* (1990) 78 Geo. L.J. 649, 664-665, fn. 87, italics added; Annot., Strict Liability of Landlord for Injury or Death of Tenant or Third Person Caused by Defect in Premises Leased for Residential Use (1986) 48 A.L.R.4th 638, 641.)

[5]The New Jersey Supreme Court subsequently ratified the decision of the intermediate appellate court in *Dwyer*, in a unanimous memorandum opinion that affirmed the judgment "substantially for the reasons expressed by the Appellate Division . . . ." (*Dwyer* v. *Skyline Apartments, Inc.* (1973) 63 N.J. 577 [311 A.2d 1].)

products or the mass builder-vendor of homes do not apply to the ordinary landlord of a multiple family dwelling. [¶] Such a landlord is not engaged in mass production whereby he places his product—the apartment—in a stream of commerce exposing it to a large number of consumers. He has not created the product with a defect which is preventable by greater care at the time of manufacture or assembly. He does not have the expertise to know and correct the condition, so as to be saddled with responsibility for a defect regardless of negligence. . . ." (*Id.* at p. 467.)

In *Young* v. *Morrisey* (1985) 285 S.C. 236 [329 S.E.2d 426, 428], the Supreme Court of South Carolina adopted the holding in *Dwyer*, adding: "We decline to hold the landlord an insurer against personal injuries to tenants and guests arising out of latent defects in construction."

Courts in several states have followed the decisions in *Dwyer* and *Young* in refusing to impose upon landlords strict liability for injuries caused by defects in leased premises. (*Duncavage* v. *Allen* (1986) 147 Ill.App.3d 88 [100 Ill.Dec 455, 497 N.E.2d 433, 442]; *Richwind* v. *Brunson* (1994) 335 Md. 661 [645 A.2d 1147, 1153, 1158]; *Scott* v. *Missouri Inv. Trust* (Mo.Ct.App. 1988) 753 S.W.2d 73, 74-75; *Livingston* v. *Begay* (1982) 98 N.M. 712 [652 P.2d 734, 737-739].) Many other states have rejected the imposition of strict liability upon landlords for similar reasons. (*Singleton* v. *Collins* (1978) 40 Colo.App. 340 [574 P.2d 882, 883]; *Meyer* v. *Parkin* (Minn.Ct.App. 1984) 350 N.W.2d 435, 438-439; *Winston Properties* v. *Sanders* (1989) 57 Ohio App.3d 28 [565 N.E.2d 1280, 1281-1282]; *Bolin Development Corp.* v. *Indart* (Tex.Ct.App. 1991) 803 S.W.2d 817, 819-820; *Williams* v. *Melby* (Utah 1985) 699 P.2d 723, 727; *Lincoln* v. *Farnkoff* (1980) 26 Wn.App. 717 [613 P.2d 1212, 1213].)

We do not lightly undertake a reexamination of the issue decided in *Becker*. ■ "The doctrine of stare decisis expresses a fundamental policy . . . that a rule once declared in an appellate decision constitutes a precedent which should normally be followed . . . . It is based on the assumption that certainty, predictability and stability in the law are the major objectives of the legal system . . . ." (9 Witkin, Cal. Procedure (3d ed. 1985) Appeal, § 758, p. 726; *Moradi-Shalal* v. *Fireman's Fund Ins. Companies* (1988) 46 Cal.3d 287, 296 [250 Cal.Rptr. 116, 758 P.2d 58].) But, as Justice Frankfurter wrote, it equally is true that " ' "[s]*tare decisis* is a principle of policy and not a mechanical formula of adherence to the latest decision, however recent and questionable, when such adherence involves collision with a prior doctrine more embracing in its scope, intrinsically sounder, and verified by experience." [Citations.]' " (*Cianci* v. *Superior Court* (1985) 40 Cal.3d 903, 923-924 [221 Cal.Rptr. 575, 710 P.2d 375], quoting *Boys Markets* v. *Clerks*

*Union* (1970) 398 U.S. 235, 240-241 [26 L.Ed.2d 199, 204-205, 90 S.Ct. 1583].) As this court has stated: "Although the doctrine [of stare decisis] does indeed serve important values, it nevertheless should not shield court-created error from correction." (*Cianci* v. *Superior Court, supra,* 40 Cal.3d at p. 924; *County of Los Angeles* v. *Faus* (1957) 48 Cal.2d 672, 679 [312 P.2d 680] ["Previous decisions should not be followed to the extent that error may be perpetuated and that wrong may result."]. See also the concurring opinion of Justice Mosk in *Smith* v. *Anderson* (1967) 67 Cal.2d 635, 646 [63 Cal.Rptr. 391, 433 P.2d 183], quoting *Wolf* v. *Colorado* (1949) 338 U.S. 25, 47 [93 L.Ed. 1782, 1795, 69 S.Ct. 1359] [" 'Wisdom too often never comes, and so one ought not to reject it merely because it comes late.' "].)

Our decision in *Becker* drastically altered established rules governing a landlord's liability for injuries caused by defects in leased premises. "At common law, the landlord was under no general duty to keep the premises in safe condition after transfer of possession . . . , and was ordinarily not liable for injuries to a tenant or his invitees, or to strangers, resulting from the defective condition of the premises, even though by the exercise of reasonable diligence he might have discovered the defects. [Citations.]" (4 Witkin, Summary of Cal. Law (9th ed. 1987) Real Property, § 595, pp. 773-774.)

In *Rowland* v. *Christian* (1968) 69 Cal.2d 108 [70 Cal.Rptr. 97, 443 P.2d 561, 32 A.L.R.3d 496], we recognized a trend in the law " 'towards "imposing on owners and occupiers a single duty of reasonable care in all the circumstances." ' (Fns. omitted.) [Citations.]" (*Id.* at p. 116.) The decision in *Rowland* abandoned, in favor of applying "ordinary principles of negligence," the common law rule that a possessor of land owed a greater duty to avoid injury to an invitee than to a trespasser and licensee or social guest. (*Id.* at p. 118.) Recognizing that "the basic policy of this state . . . is that everyone is responsible for an injury caused to another by his want of ordinary care or skill in the management of his property" (*id.* at p. 119), we held: "The proper test to be applied to the liability of the possessor of land . . . is whether in the management of his property he has acted as a reasonable man in view of the probability of injury to others . . . ." (*Ibid.*)

In *Brennan* v. *Cockrell Investments, Inc.* (1973) 35 Cal.App.3d 796 [111 Cal.Rptr. 122], the Court of Appeal, applying our decision in *Rowland* to an action against a landlord brought by a tenant who had been injured by a defective condition of the leased premises, held that we had abolished the common law rule that (subject to specified exceptions) a landlord is not liable for injuries to a tenant caused by a defect in leased premises: "Possession and degree of control over the premises are significant factors to be weighed in determining whether or not the landlord failed to meet the

statutory standard of care. Indeed, these considerations go to the very essence of the negligence issue. But it is impossible to perceive any legitimate public interest that would be promoted by the creation of a landlord immunity exception . . . . That a landlord must act toward his tenant as a reasonable person under all of the circumstances . . . seems a sound proposition and one that expresses well the principles of justice and reasonableness upon which the law of torts is based." (*Id.* at pp. 800-801.)

In addition to discussing strict liability, the decision in *Becker*, as previously noted, considered the plaintiff's cause of action for negligence, expanding upon the standard enunciated in *Brennan* v. *Cockrell Investments, Inc., supra*: "[A] landlord in caring for his property must act toward his tenant as a reasonable person under all of the circumstances including the likelihood of injury, the probable seriousness of injury, the burden of reducing or avoiding the risk, and his degree of control over the risk-creating defect. [Citations.]" (*Becker, supra*, 38 Cal.3d 454, 468.) The decision in *Becker* further held that a landlord has a duty to inspect rental premises "to determine whether they meet bare living standards, including whether they are safe," both when purchasing the rental property and when leasing the premises to a tenant. (*Ibid.*) This court distinguished those cases in which injuries were caused by defects that "developed after purchase of the building by the defendant and while the apartment was in possession of the tenant," observing that "[t]he duty to inspect should charge the defendant only with those matters which would have been disclosed by a reasonable. inspection." (*Id.* at p. 469.)

In the portion of the opinion addressing the products liability doctrine, however, the decision in *Becker* went far beyond holding landlords liable for injuries caused by their own fault, and imposed liability for injuries caused by defects that the landlord had not created, that would not have been disclosed by a reasonable inspection, and of which the landlord had no knowledge. As noted above, *Becker* applied principles of products liability and held "that a landlord engaged in the business of leasing dwellings is strictly liable in tort for injuries resulting from a latent defect in the premises when the defect existed at the time the premises were let to the tenant. [Fn. omitted.]" (*Becker, supra*, 38 Cal.3d 454, 464.)

The effect of imposing upon landlords liability without fault is to compel them to insure the safety of their tenants in situations in which injury is caused by a defect of which the landlord neither knew nor should have known. As noted above, every other jurisdiction that has considered this

issue expressly has rejected the approach followed by *Becker*.[6] "[A land-lord's] duty is not to insure the safety of tenants but only to exercise reasonable care." (*Dwyer* v. *Skyline Apartments, Inc., supra*, 301 A.2d 463, 465.) Nearly identical statements appear in *Richwind* v. *Brunson, supra*, 645 A.2d 1147, 1153, *Segal* v. *Justice Court Mutual Housing Cooperative, Inc., supra*, 432 N.Y.S.2d 463, 467, affirmed 442 N.Y.S.2d 686, *Young* v. *Morrisey, supra*, 329 S.E.2d 426, 428, and *Williams* v. *Melby, supra*, 699 P.2d 723, 727. The Restatement Second of Property, Landlord and Tenant, section 17.6, comment c, at page 233 states: "The landlord is subject to liability under the rules of this section only for conditions of which he is aware, or of which he could have known in the exercise of reasonable care."

Justifying its significant and unprecedented expansion of a landlord's liability for injuries to tenants by applying the law of products liability to the relationship between landlord and tenant, *Becker* reasoned that an apartment itself should be considered a "product" that a landlord places into the stream of commerce. *Becker*'s reasoning in reaching that conclusion, however, is flawed in several respects.

As noted in *Becker*, this court held in *Greenman* v. *Yuba Power Products, Inc., supra*, 59 Cal.2d 57, 62, that "[a] manufacturer is strictly liable in tort when an article he places on the market, knowing that it is to be used without inspection for defects, proves to have a defect that causes injury to a human being." In *Vandermark* v. *Ford Motor Co., supra*, 61 Cal.2d 256, 262-263, we held that a retailer of manufactured goods also is strictly liable in tort: "Retailers like manufacturers are engaged in the business of distributing goods to the public. They are an integral part of the overall producing and marketing enterprise that should bear the cost of injuries resulting from defective products. [Citation.] In some cases the retailer may be the only member of that enterprise reasonably available to the injured plaintiff. In other cases the retailer himself may play a substantial part in insuring that the product is safe or may be in a position to exert pressure on the manufacturer to that end; the retailer's strict liability thus serves as an added incentive to safety. Strict liability on the manufacturer and retailer alike affords maximum protection to the injured plaintiff and works no injustice to the defendants, for they can adjust the costs of such protection between them in the course of their continuing business relationship."

Most of the preceding reasons for imposing strict liability upon a retailer of a defective product do not apply to landlords or hotel proprietors who rent

---

[6]As we observed, only Louisiana imposes strict liability upon landlords, and there the legislature has adopted it by statute and it is not based upon the doctrine of products liability. (*Marcantel* v. *Karam, supra*, 601 So.2d 1, 2.)

residential premises.[7] A landlord or hotel owner, unlike a retailer, often cannot exert pressure upon the manufacturer to make the product safe and cannot share with the manufacturer the costs of insuring the safety of the tenant, because a landlord or hotel owner generally has no "continuing business relationship" with the manufacturer of the defective product. As one commentator has observed: "If the objective of the application of the stream of commerce approach is to distribute the risk of providing a product to society by allowing an injured plaintiff to find a remedy for injury along the chain of distribution, it will probably fail in the landlord/tenant situation. The cost of insuring risk will not be distributed along the chain of commerce but will probably be absorbed by tenants who will pay increased rents. One could argue that this was not the effect sought by the court in earlier cases which anticipated that the cost of risk would be distributed vertically in the stream of commerce." (Note, *Becker v. IRM Corporation: Strict Liability in Tort for Residential Landlords, supra,* 16 Golden Gate L.Rev. 349, 360.)[8]

In the present case, for example, plaintiff's products liability claim is premised upon the assertion that the bathtub in her hotel room was defective because its surface was too slippery. But a hotel owner is not a part of the chain of distribution of a bathtub that is installed in a hotel room, just as a restaurant owner is not the equivalent of a retailer of toilets simply because the restaurant provides restroom facilities to its patrons, and just as an owner of a business is not the equivalent of a retailer of ceiling fans simply because one is installed on the premises to promote the comfort of customers of the business. In such circumstances, the bathtub, toilets, and ceiling fans left the stream of commerce when they were purchased and installed in the premises of the various businesses. The mere circumstance that it was contemplated customers of these businesses would use the products in question or be benefited by them does not transform the owners of the businesses into the

---

[7]"The *Becker* court based its adoption of strict landlord liability on the analogy between tenants and consumers of products. The court, however, focused on the similarities between tenants and consumers without fully considering whether the policy justifications for strict products liability apply to strict landlord liability." (Comment, *California's Approach to Landlord Liability for Tenant Injuries: Strict Liability Reexamined, supra,* 26 U.C. Davis L.Rev. 367, 394-395.)

[8]This point was echoed in another article: "Generally, landlords neither design nor manufacture the products they supply. Therefore, unlike manufacturers, landlords have limited control over safety of design and workmanship. Holding landlords strictly liable when defects beyond their control injure tenants is unfair. Moreover, unlike retailers or distributors, landlords generally have no continuing business relationship with the builders responsible for such defects. Because landlords will not be able to receive indemnity or contribution from builders who are no longer in business, imposing strict landlord liability makes them 'the last outpost of liability.' They are thus forced to bear the burden of tenant injuries even though they may be innocent of any wrongdoing." (Comment, *California's Approach to Landlord Liability for Tenant Injuries: Strict Liability Reexamined, supra,* 26 U.C. Davis L.Rev. 367, 402-403, fns. omitted.)

equivalent of retailers of the products. (See cases cited in 1 Am. Law of Products Liability 3d (1994 rev.) Liability of Parties in Chain of Distribution, § 5:33, pp. 55-56.)

We need not, and do not, decide whether different considerations would apply in the event the landlord or hotel owner had participated in the construction of the building. (See *Becker, supra,* 38 Cal.3d 454, 480-481 (conc. and dis. opn. of Lucas, J.).) But in such circumstances strict liability would attach, if at all, based upon the landlord's status as a builder who is engaged in the business of constructing (i.e. manufacturing) rental properties. (See *Price* v. *Shell Oil Co.* (1970) 2 Cal.3d 245, 251 [85 Cal.Rptr. 178, 466 P.2d 722], citing *Kriegler* v. *Eichler Homes, Inc.* (1969) 269 Cal.App.2d 224, 227 [74 Cal.Rptr. 749].)

The record before us in the present case does not disclose whether defendants constructed the hotel.[9] Plaintiff did not argue in the courts below, or in the briefs filed in this court, that strict liability applies because defendants had constructed the hotel. Accordingly, neither the trial court nor the Court of Appeal ruled upon this issue. Thus, we express no opinion regarding whether, or under what circumstances, strict liability might be imposed upon a landlord or hotel proprietor who participated in the construction of the building or otherwise created the defective product that caused the injury. On remand, plaintiff may seek leave from the superior court to raise such issues.

■ The conclusion that a landlord or hotel proprietor, unlike a retailer, is not strictly liable in tort is supported by those cases holding that a seller of

---

[9] At oral argument, counsel for plaintiff asserted that the record does reflect that defendants constructed the hotel, counsel having cited in support of this assertion paragraph 17 of the first amended complaint. The cited paragraph does not allege, however, that defendants constructed the hotel. Instead, that paragraph alleges, with reference to the strict liability cause of action, that defendants "manufactured, packaged, designed, distributed, tested, constructed, fabricated, analyzed, recommended, merchandised, promoted, sold, supplied, provided for the use of the public, and/or otherwise served as an integral part of the overall marketing enterprise the specific defective *bathtub* . . . ." (Italics added.) Paragraph 9 of the negligence cause of action (which was incorporated by reference in the strict liability cause of action) alleges broadly, based upon information and belief, that defendants "built, constructed, designed, planned, and created, each, every, and all the relevant property conditions at the PALM SPRINGS MARQUIS HOTEL . . . ." Even if either of these boilerplate allegations reasonably could be construed to include an allegation that defendants had constructed the hotel, defendants denied these allegations in their answer, and the record before us does not reflect any evidence relating to whether defendants constructed the hotel.

Following oral argument, plaintiff submitted a letter with a few pages of a reporter's transcript attached, which plaintiff asserted demonstrated that defendants had built the hotel. Defendants, in a letter in response, dispute plaintiff's interpretation of this transcript. The material proffered by plaintiff is outside the record before us, and we shall not consider it, because it was not relied upon by plaintiff in the superior court and was not included in the exhibits submitted to the Court of Appeal in support of the petition for writ of mandate.

used machinery is not strictly liable in tort, unless the seller rebuilds or reconditions the product and thus assumes a role analogous to that of a manufacturer. In *Wilkinson* v. *Hicks* (1981) 126 Cal.App.3d 515 [179 Cal.Rptr. 5], the plaintiff's hand was crushed while operating a punch press which the defendant, a dealer in used machinery, had sold to the plaintiff's employer. Evidence was introduced that a safety device that was part of the machine when it was built more than 50 years earlier apparently had been removed by a previous owner. Prior to the sale, the defendant had seen the machine in operation and observed that it was in good operating condition. The previous owner had experienced no malfunctions. The defendant sold the machine to the plaintiff's employer "as is" and, although the defendant's employees "tried out" the machine prior to delivering it, they made no adjustments or modifications to the machine.

The Court of Appeal held that a seller of used machinery such as the defendant is not strictly liable in tort for injuries caused by a defective product: "To impose such liability would as a practical matter require all dealers in used goods routinely to dismantle, inspect for latent defects, and repair or recondition their products. . . . It would in effect render used goods dealers as insurers against defects which came into existence after the original chain of distribution and while the product was under the control of previous consumers. [Citations.]" (*Wilkinson* v. *Hicks, supra,* 126 Cal.App.3d at p. 521; see *Anderson* v. *Owens-Corning Fiberglas Corp.* (1991) 53 Cal.3d 987, 994 [281 Cal.Rptr. 528, 810 P.2d 549] ["Strict liability, however, was never intended to make the manufacturer or distributor of a product its insurer."].)

The court in *LaRosa* v. *Superior Court* (1981) 122 Cal.App.3d 741, 749 [176 Cal.Rptr. 224] reached the same result on similar facts, concluding that a seller of used machinery is not " 'an integral part of the overall producing and marketing enterprise' for the product" within the meaning of the decision in *Vandermark, supra.*

*Tauber-Arons Auctioneers Co.* v. *Superior Court* (1980) 101 Cal.App.3d 268, 274 [161 Cal.Rptr. 789] held that an auctioneer is not strictly liable in tort for injuries caused by defects in used machinery sold at auction. (Accord, *Brejcha* v. *Wilson Machinery, Inc.* (1984) 160 Cal.App.3d 630, 639-640 [206 Cal.Rptr. 688].) The decision states: "[T]he marketing enterprise, participation in which would justify imposition of strict liability for a defect created by the manufacturer, is the enterprise by which *initial* distribution of the particular manufacturer's products to the consuming public is effected." (101 Cal.App.3d at p. 277, italics added.) Adopting the reasoning of the Oregon Supreme Court in *Tillman* v. *Vance Equipment Co.* (1979) 286

Ore. 747 [596 P.2d 1299], the court in *Tauber-Arons* identified three justifications for the imposition of strict liability for defective products—loss spreading, implied representation of safety, and impetus to manufacture a safer product. (101 Cal.App.3d at p. 280.)

Regarding the final factor, the decision in *Tauber-Arons* quotes at length from the decision in *Tillman*: " 'As to the risk-reduction aspect of strict products liability, the position of the used-goods dealer is normally entirely outside the original chain of distribution of the product. As a consequence, we conclude, any risk reduction which would be accomplished by imposing strict liability on the dealer in used goods would not be significant enough to justify our taking that step. The dealer in used goods generally has no direct relationship with either manufacturers or distributors. Thus, there is no ready channel of communication by which the dealer and the manufacturer can exchange information about possible dangerous defects in particular product lines or about actual and potential liability claims.' " (*Tauber-Arons Auctioneers Co.* v. *Superior Court, supra*, 101 Cal.App.3d 268, 281-282.)

This reasoning applies with even greater force to a landlord or hotel owner who purchases an apartment building or hotel. Defects in such a structure may have been created by the builder, a subcontractor, a manufacturer of building supplies or fixtures, a previous owner of the building, or a previous tenant of the apartment or guest of the hotel. Because the landlord or hotel owner generally has no continuing business relationship, or other ready channel of communication, with any of these persons or entities, only in rare cases would the imposition of strict liability upon the landlord or hotel owner create an impetus to manufacture safer products. As one commentator has recognized: "Unlike other suppliers . . . , landlords' ability to improve their products' safety is rather limited. Landlords cannot redesign the products or switch manufacturers; they can only repair the defects they know about. While imposing strict landlord liability will encourage landlords to make such repairs, it provides no greater safety incentive than imposing negligence liability." (Comment, *California's Approach to Landlord Liability for Tenant Injuries: Strict Liability Reexamined, supra*, 26 U.C. Davis L. Rev. 367, 405, fns. omitted.)

As to the second justification for the imposition of strict liability—an implied representation of safety—the decision in *Tauber-Arons* again quotes the decision in *Tillman*: " '[T]he sale of a used product, without more, may not be found to generate the kind of expectations of safety that the courts have held are justifiably created by the introduction of a new product into the stream of commerce.' " (*Tauber-Arons Auctioneers Co.* v. *Superior Court, supra*, 101 Cal.App.3d 268, 281.)

This court in *Becker* held, to the contrary, that a tenant renting a dwelling has an expectation of safety similar to that of a consumer purchasing a new product, even if the building is not new. This conclusion was based upon the implied warranty of habitability contained in a residential lease, recognized in *Green* v. *Superior Court* (1974) 10 Cal.3d 616 [111 Cal.Rptr. 704, 517 P.2d 1168]—a warranty that the court in *Becker* viewed as constituting an "implied assurance of safety made by the landlord." (*Becker, supra,* 38 Cal.3d at p. 465.) The conclusion reached in *Becker,* however, overstates the effect of the implied warranty recognized in *Green.*

Our decision in *Green* reflected a national trend to replace the outmoded common law doctrine that a landlord was under no duty to maintain leased dwellings in a habitable condition during the term of the lease, with a rule more in line with the modern reality that every lease of a dwelling contains an implied warranty of habitability. (*Green* v. *Superior Court, supra,* 10 Cal.3d 616, 619.) The rationale behind judicial recognition of an implied warranty of habitability in residential leases has been explained by one commentator as follows: "In the 1960s and 1970s nearly all states imposed on landlords an obligation to maintain the habitability of leased premises. One of many reasons for the adoption of this obligation was that economic changes had rendered the old rule of caveat emptor inappropriate. . . . The doctrine [of caveat emptor] arose out of an agrarian economy in which landlords and tenants typically had equal skills in inspecting and repairing property. Because leases largely covered farmland, the value of the structures on the land was of secondary importance. In the opinion of early courts, a lease was viewed most accurately as a conveyance of property from one party to another. Today, by contrast, a residential lease typically involves a bundle of goods and services and envisions a continuing relationship between the landlord and tenant. For the typical tenant, the apartment or house being leased is far more important than the land.

"A second reason for the new warranty was the typical inequality in bargaining positions of the landlord and tenant. . . . In the view of many, the law needed to respond to this inequality and restore the parties to a reasonable balance.

"A third reason . . . was that landlords were usually better positioned to make needed repairs. In multi-unit structures, tenants often had no access to the central elements of the building such as water, electrical, heating, and cooling systems. . . . As short-term leases became the norm, tenants had insufficient financial incentive to make major structural repairs.

"Tenant expectations also played an important role. . . . Tenants leased homes, and they expected to be able to move into their homes without undue

trouble or expense. They expected toilets to flush and furnaces to heat. To an increasing extent, they leased appliances as well as space, and they expected the appliances to function properly. Repairs with a long useful life, they believed, were the proper province of the landlord. Just as the tenant had an obligation to pay rent every month, the landlord had a continuing obligation to provide good shelter month by month. . . .

"Perhaps the prime motive behind the new habitability duty, however, was the public policy concern over the quality of the nation's housing stock. Dilapidated housing was a public as well as a private concern. Substandard housing created filth that spread to the streets. It bred disease if not crime. It was an eyesore and a public disgrace . . . . Housing codes attempted to address this problem, but their enforcement was dramatically inadequate. Private enforcement seemed necessary, and the new habitability duty seemed to be a useful enforcement tool." (Freyfogle, *The Installment Land Contract as Lease: Habitability Protections and the Low-income Purchaser* (1987) 62 N.Y.U. L.Rev. 293, 297-299, fns. omitted.)

The implied warranty of habitability recognizes "the realities of the modern urban landlord-tenant relationship" and imposes upon the landlord the obligation to maintain leased dwellings in a habitable condition throughout the term of the lease. (*Green* v. *Superior Court, supra,* 10 Cal.3d 616, 619.) But deriving from this implied warranty an obligation on the part of the landlord to insure the safety of leased premises by imposing strict liability for injuries to tenants caused by defects in the premises goes far beyond this laudable goal. Rather than restore the parties to a reasonable balance, the doctrine of strict liability places an undue burden upon the landlord—regardless of fault or ability to avoid injury. Rather than obligate the landlord to promptly repair defects of which the landlord knows or should know, the doctrine often will impose an onerous burden to discover and correct defects that would not be disclosed by a reasonable inspection. Rather than obligate the landlord to comply with applicable housing codes[10] and maintain the dwelling in a habitable condition, application of the products liability doctrine imposes strict liability upon the landlord, even when the landlord has taken all reasonable steps to render the dwelling safe.

---

[10]The failure of a landlord, or a hotel proprietor, to comply with applicable statutes and ordinances may constitute negligence per se. Evidence Code section 669 states: "The failure of a person to exercise due care is presumed if: [¶] (1) He violated a statute, ordinance, or regulation of a public entity; [¶] (2) The violation proximately caused death or injury to person or property; [¶] (3) The death or injury resulted from an occurrence of the nature which the statute, ordinance, or regulation was designed to prevent; and [¶] (4) The person suffering the death or the injury to his person or property was one of the class of persons for whose protection the statute, ordinance, or regulation was adopted." (See *Stafford* v. *United Farm Workers* (1983) 33 Cal.3d 319, 324 [188 Cal.Rptr. 600, 656 P.2d 564].)

■ The reasoning in *Becker* is flawed because recognition of the implied warranty of habitability does not lead to the conclusion that a landlord is strictly liable for injuries to tenants caused by defects in the premises.[11] Although, as noted above, nearly all states have recognized an implied warranty of habitability in residential leases, only California (by judicial decision) and Louisiana (by statute) hold landlords strictly liable for injuries to tenants caused by defects in the premises. One commentator has explained this trend as follows: "Gradually, . . . courts are realizing that the implied warranty is actually a covenant rather than a warranty, which means that breaches need not give rise to excessive tort liability. The landlord's repair covenant is (or at least should be) breached only if the landlord fails to fix a problem within a reasonable period after notice. It is the landlord's inaction —the landlord's negligence—that gives rise to liability." (Freyfogle, *The Installment Land Contract as Lease: Habitability Protections and the Low-income Purchaser, supra*, 62 N. Y. U. L.Rev. 293, 302, fns. omitted.) One advantage to the approach of viewing the implied warranty as a covenant is that it applies equally to all landlords, whether or not they are "in the business of leasing dwellings." (*Becker, supra*, 38 Cal.3d at p. 464; *Vaerst v. Tanzman, supra*, 222 Cal.App.3d at p. 1540 [a landlord "who leased his own family residence to the tenants on a temporary basis . . . is not within the purview of *Becker* . . . ."].)

The implied warranty of habitability recognized in *Green* gives a tenant a reasonable expectation that the landlord has inspected the rental dwelling and corrected any defects disclosed by that inspection that would render the dwelling uninhabitable. The tenant further reasonably can expect that the landlord will maintain the property in a habitable condition by repairing promptly any conditions, of which the landlord has actual or constructive notice, that arise during the tenancy and render the dwelling uninhabitable.[12]

[11]Section 17.6 of the Restatement Second of Property provides that a landlord's liability is governed by a negligence standard when an injury results from the landlord's breach of an implied warranty of habitability: "A landlord is subject to liability for physical harm caused to the tenant . . . by a dangerous condition existing before or arising after the tenant has taken possession, if he has failed to exercise reasonable care to repair the condition and the existence of the condition is in violation of: [¶] (1) an implied warranty of habitability . . . ."

[12]"The product to which the *Green* court referred seems to be the 'package of goods and services' performed by the landlord, such as the supplying of adequate heat, light, and ventilation, serviceable plumbing facilities, secure windows and doors, proper sanitation and proper maintenance. In *Green*, the 'product'—this package of goods and services—was found to be 'defective' only after the landlord had been given notice of and an opportunity to correct the conditions rendering the dwelling uninhabitable." (Note, *A Bird in the Hand: California Imposes Strict Liability on Landlords in Becker v. IRM Corp., supra*, 20 Loyola L.A. L.Rev. 323, 350, fns. omitted.)

We stated in *Green*: "Under the implied warranty which we recognize, a residential landlord covenants that premises he leases for living quarters *will be maintained* in a habitable

A tenant injured by a defect in the premises, therefore, may bring a negligence action if the landlord breached its duty to exercise reasonable care.[13] But a tenant cannot reasonably expect that the landlord will have eliminated defects in a rented dwelling of which the landlord was unaware and which would not have been disclosed by a reasonable inspection. The implied warranty of habitability, therefore, does not support an action for strict liability.

Even before the advent of the implied warranty of habitability applicable to residential leases, it was recognized that hotel proprietors have a special relationship with their guests that gives rise to a duty similar to that owed by common carriers "to protect them against unreasonable risk of physical harm." (Rest.2d Torts, § 314A.) "The duty in each case is only one to exercise reasonable care under the circumstances. The defendant is not liable where he neither knows nor should know of the unreasonable risk . . . ." (*Id.*, com. e, at p. 120.) We have recognized that an innkeeper, like a common carrier, is not an insurer of the safety of its guests. (*Lopez* v. *Southern Cal. Rapid Transit Dist.* (1985) 40 Cal.3d 780, 785, 788 [221 Cal.Rptr. 840, 710 P.2d 907]; *Nash* v. *Fifth Amendment* (1991) 228 Cal.App.3d 1106, 1111 [279 Cal.Rptr. 465].)

■ A hotel guest reasonably can expect that the hotel owner diligently will inspect the hotel room for defects and will correct any defects discovered. But the guest cannot reasonably expect that the owner will correct defects of which the owner is unaware and that cannot be discerned by a reasonable inspection. The duty of an innkeeper, therefore, like the duty of a landlord, does not support an action for strict liability.

The remaining justification for the imposition of strict liability discussed in *Tauber-Arons* is loss spreading. *Becker* relied upon this factor almost exclusively in distinguishing the rule, announced in *Tauber-Arons* and its progeny, that strict liability should not be imposed upon sellers of used

---

state for the duration of the lease. This implied warranty of habitability does not require that a landlord ensure that leased premises are in perfect, aesthetically pleasing condition, but it does mean that 'bare living requirements' must be *maintained*. [Fn. omitted.] In most cases substantial compliance with those applicable building and housing code standards which materially affect health and safety will suffice to meet the landlord's obligations under the common law implied warranty of habitability we now recognize. [Fn. omitted.]" (*Green* v. *Superior Court, supra,* 10 Cal.3d 616, 637, italics added.)

[13]As noted above, the portion of the *Becker* decision discussing negligence held that a landlord's responsibility (under the decision in *Green*) to maintain residential rental property in a habitable condition gives rise to a duty to inspect the property. This court recognized, however, that "[t]he duty to inspect should charge the defendant only with those matters which would have been disclosed by a reasonable inspection." (*Becker, supra,* 38 Cal.3d at p. 469.)

merchandise: "The paramount policy of the strict products liability rule remains the spreading throughout society of the cost of compensating otherwise defenseless victims of manufacturing defects. [Citations.]" (*Becker, supra*, 38 Cal.3d at p. 466.) But the court in *Tauber-Arons*, quoting a similar statement from this court's decision in *Price* v. *Shell Oil Co., supra*, 2 Cal.3d 245, 251, that loss spreading was a "paramount policy" of products liability law, correctly observed that this court in *Price* "did not, however, abandon all other considerations." (*Tauber-Arons Auctioneers Co.* v. *Superior Court, supra*, 101 Cal.App.3d 268, 283.) Instead, the decision in *Price* states: "In *Vandermark* we again emphasized the necessity for a continuous course of business as a condition to application of the rule," observing that, under such circumstances, the imposition of strict liability "works no injustice to the defendants." (*Price* v. *Shell Oil Co., supra*, 2 Cal.3d 245, 253-254.)

In many instances, it would be unjust to hold a landlord strictly liable for an injury to a tenant caused by a defect of which the landlord had no knowledge and which would not have been disclosed by a reasonable inspection. One commentator posed a hypothetical situation in which a tenant was injured by a construction defect, the landlord was held strictly liable, and the resulting judgment exceeded the limits of the landlord's insurance coverage. Noting the "potential for harsh results" inherent in *Becker*'s rule of strict liability, the commentator observed: "When latent defects injure tenants, both landlords and tenants are innocent of any wrongdoing. The primary justification for shifting accident costs from innocent tenants to equally innocent landlords is 'loss-spreading.' The landlord has access to liability insurance, and thus, in theory, can spread the costs of injuries that would financially devastate an individual. In reality, however, insurance policies have limits, and, as in the hypothetical, holding landlords strictly liable sometimes substitutes one innocent victim for another." (Comment, *California's Approach to Landlord Liability for Tenant Injuries: Strict Liability Reexamined, supra*, 26 U.C. Davis L.Rev. 367, 371.)

For the same reasons, it often would be unjust to hold a hotel proprietor strictly liable for an injury to a hotel guest caused by a defect in the premises, of which the hotel proprietor was unaware, and which would not have been disclosed by a reasonable inspection. The economic consequences could be particularly onerous for the operators of small establishments, such as small motels or bed and breakfast inns, who, through no fault of their own, could be rendered financially insolvent if a grievous injury to a guest caused by an unknown defect in the premises resulted in a judgment that exceeded available insurance coverage.

Subsequent to the decision in *Becker*, this court reaffirmed in *Brown* v. *Superior Court* (1988) 44 Cal.3d 1049 [245 Cal.Rptr. 412, 751 P.2d 470] that

loss spreading is not the sole consideration in determining whether to impose strict liability for injuries resulting from a defective product. The plaintiffs in *Brown* allegedly were injured in utero when their mothers, in order to prevent miscarriage, ingested the drug "DES" during pregnancy. In considering whether the manufacturers of this drug should be held strictly liable in tort, we noted that "the fundamental reasons underlying the imposition of strict liability are to deter manufacturers from marketing products that are unsafe, and to spread the cost of injury from the plaintiff to the consuming public." (*Id.* at p. 1062.) We recognized that "[t]hese reasons could justify application of the doctrine to the manufacturer of prescription drugs. It is indisputable . . . that the risk of injury from such drugs is unavoidable, that a consumer may be helpless to protect himself from serious harm caused by them, and that, like other products, the cost of insuring against strict liability can be passed on by the producer to the consumer who buys the item." (*Id.* at p. 1063.) Nevertheless, for reasons of public policy inapplicable to the present case, we held that the manufacturers of prescription drugs should not be held strictly liable in tort, even if the drug was defectively designed.

In another case decided after *Becker*, this court held that a manufacturer cannot be held strictly liable for failing to warn of dangers that were unknowable at the time of manufacture or distribution, and reiterated the point that the function of loss spreading should not be the exclusive criterion upon which to premise strict liability: "We recognize that an important goal of strict liability is to spread the risks and costs of injury to those most able to bear them. However, it was never the intention of the drafters of the doctrine to make the manufacturer or distributor the insurer of the safety of their products. It was never their intention to impose *absolute* liability." (*Anderson* v. *Owens-Corning Fiberglas Corp.*, *supra*, 53 Cal.3d 987, 1003-1004, italics in original, fn. omitted.)

Another problem with relying exclusively upon the doctrine of loss spreading to justify the imposition of liability without fault is that the same reasoning could be used to impose strict liability in *any* situation in which the defendant is in a superior position economically to bear or distribute the loss suffered by the plaintiff. As one commentator has observed: "Spreading the cost of injury throughout society amounts to no more than a judicially imposed insurance system. To use this rationale for imposing strict liability in isolation of other rationales is to write a judicial ticket to impose strict liability in any area of law where there are injured plaintiffs who may not be compensated." (Note, *A Bird in the Hand: California Imposes Strict Liability on Landlords in Becker v. IRM Corp.*, *supra*, 20 Loyola L.A. L.Rev. 323, 370.)

As the foregoing discussion demonstrates, the reasons for not applying the doctrine of strict products liability to sellers of used goods support, as well,

the conclusion that landlords and hotel owners should not be held strictly liable in tort for injuries to tenants and hotel guests caused by defects in the premises. A landlord or hotel owner who rents dwellings or hotel rooms differs significantly from a manufacturer or retailer of a product. Manufacturers and retailers can be expected to possess expert knowledge concerning the product being produced or sold, but the same is not necessarily true of a landlord or hotel owner. As one commentator has observed: "[I]t is one thing to say that a landlord is an expert at leasing rental dwellings. It is quite another to say that a landlord possesses expert knowledge of the myriad of components which comprise the leased dwelling. Because of the practical impossibility of obtaining expert knowledge of all the components of an apartment, landlords must rely on others for their safe manufacture, installation and repair. In this respect, landlords are in no better position to know of defects than are tenants, yet they are held to the ultimate standard." (Note, *A Bird in the Hand: California Imposes Strict Liability on Landlords in Becker v. IRM Corp.*, *supra*, 20 Loyola L.A. L.Rev. 323, 356, fns. omitted.)[14]

Another concern arising from *Becker*'s imposition of strict liability upon landlords stems from the rule that a manufacturer may defend a products liability action by establishing that "the benefits of the challenged design outweigh the risk of danger inherent in such design." (*Barker* v. *Lull Engineering Co.* (1978) 20 Cal.3d 413, 432 [143 Cal.Rptr. 225, 573 P.2d 443, 96 A.L.R.3d 1].) Among the factors the finder of fact may consider in making this determination are "the gravity of the danger posed by the challenged design, the likelihood that such danger would occur, the mechanical feasibility of a safer alternative design, the financial cost of an improved design, and the adverse consequences to the product and to the consumer that would result from an alternative design. [Citations.]" (*Id.* at p. 431.)

This court has recognized that most of these factors "involve technical matters peculiarly within the knowledge of the manufacturer." (*Barker* v. *Lull Engineering Co.*, *supra*, 20 Cal.3d at p. 431.) A landlord or hotel proprietor frequently is in no position to mount such a defense. As one commentator has noted: "[W]ill a defendant landlord, faced with an unavailable manufacturer—a situation which the majority [in *Becker*] concludes is a

---

[14]Another commentator has stated: "The extension of strict liability to all landlords is inequitable. Landlords who assume ownership after a building is completed are not in a position to detect and cure defects. Furthermore, these landlords have no meaningful choice about the inclusion of a building's basic components or fixtures. Although the trend in landlord/tenant law is to increase the liability of landlords, strict liability is not justified when the landlord is not instrumental in placing the defective item in the primary stream of commerce." (Note, *Landlord-Tenant: Landlord's Strict Liability for Personal Injury Arising from Latent Defects in Premises—Becker v. IRM Corp., 38 Cal.3d 454, 698 P.2d 116, 213 Cal. Rptr. 213 (1985)*, *supra*, 1986 Ariz. St. L.J. 561, 582, fns. omitted.)

proper reason for extending liability—be expected to defend the technical advantages of a product without access to information or experts describing the origin and formulation of a particular design? Must the landlord defend the product to defend himself? If not, how *does* he defend himself?" (Note, *Let the Landlord Beware: California Imposes Strict Liability on Lessors of Rental Housing, supra,* 51 Mo. L.Rev. 899, 908, italics in original, fns. omitted.)

█ For all of the foregoing reasons, we conclude that the decision in *Becker* v. *IRM Corp., supra,* 38 Cal.3d 454, was incorrect in holding that a landlord is strictly liable on the basis of products liability for injuries to a tenant caused by a defect in a leased dwelling. To the extent it so holds, the decision in *Becker* is overruled. For these same reasons, we further hold that the proprietor of a hotel should not be held strictly liable on the basis of products liability for injuries to a guest caused by a defect in the premises.

As we noted at the outset of this opinion, the conclusion we reach by no means absolves hotel proprietors or landlords of all potential responsibility for such injuries; on the contrary, hotel proprietors and landlords still may be held liable under general tort principles for injuries resulting from defects in their premises if they have breached the applicable standard of care. Neither is the injured tenant or guest deprived of any strict products liability cause of action that may lie against the manufacturer, distributor, or retailer of a defective product that causes the injury. In the present case, for example, plaintiff named as a defendant the manufacturer of the bathtub and has entered into a settlement with the manufacturer for the sum of $600,000. Upon remand, plaintiff may proceed against the remaining defendants on her cause of action for negligence.

### III

The judgment of the Court of Appeal is reversed to the extent it directs the superior court to permit plaintiff to proceed against defendants hotel owner and operator upon the theory of strict products liability; in all other respects, the judgment of the Court of Appeal is affirmed.

Lucas, C. J., Mosk, J., Kennard, J., Arabian, J., Baxter, J., and Werdegar, J., concurred.