Filed 3/30/21  Radcliff v. Interfaith Community Services CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| VICTORIA C. RADCLIFF, | D076650 |
| Plaintiff and Appellant, | |
| v. | |
| INTERFAITH COMMUNITY SERVICES et al., | (Super. Ct. No. 37-2018-00019977-CU-WE-NC) |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of San Diego County, Jacqueline M. Stern, Judge.  Affirmed.

Victoria C. Radcliff, in pro. per., for Plaintiff and Appellant.

Daley & Heft, Lee H. Roistacher; Brockman Quayle Bennett, Robert H. Quayle IV and Rachel B. Kushner for Defendants and Respondents.

Victoria Radcliff signed a lease agreement for a room in a shared apartment at a housing facility for homeless seniors owned by Interfaith Community Services, Inc. (Interfaith).  Less than two months later, she moved out after many conflicts with her roommate.

Two and one-half years later, Radcliff brought an action against Interfaith and several of its managers and officers (Individual Defendants[1]), asserting contract and tort causes of action. Defendants twice demurred, and the court sustained the demurrers on some of the claims, but overruled them on three causes of action: (1) constructive eviction; (2) breach of the warranty of habitability; and (3) breach of contract.

Defendants then successfully moved for summary judgment. Radcliff appeals. We affirm. Defendants met their summary judgment burden by presenting admissible evidence establishing Radcliff could not prove the three claims, and Radcliff did not meet her burden to present admissible evidence showing a triable issue of material fact on any of these claims.

FACTUAL AND PROCEDURAL SUMMARY

A. *Allegations in Second Amended Complaint*

We describe the allegations of the operative complaint in some detail because it is these allegations to which a summary judgment motion must be directed. (See *Borman v. Brown* (2021) 59 Cal.App.5th 1048, 1055.)

According to her complaint, Radcliff is a "homeless disabled senior citizen diagnosed with post-traumatic stress disorder, major depressive disorder, acute anxiety disorder, hypertension, and tachycardia." She alleged Interfaith represents that it provides services and programs addressing "the needs of homeless, low-income and under-served people" to " 'empower' " them on issues of "employment, self-sufficiency, behavioral health, substance abuse and housing," seeking to " 'reverse the cycle of homelessness' to 'get . . . clients back on their feet.' "

---

[1]     Individual Defendants are Greg Anglea, Filipa Rios, Traci Chester, Matthew Brown, Cheryl Paster, and Joseph Snyder.

2

On July 20, 2015, Radcliff met with defendant Matthew Brown, Interfaith's client advocate and housing case manager. The two discussed Interfaith's program and Radcliff's desire to live at Interfaith's residential apartments. Radcliff told Brown about her adult daughter (Daughter), and Radcliff said she needed Daughter to stay with her to serve as her caregiver. Brown allegedly agreed to allow Daughter to stay in the apartment as a guest for 30 days until Radcliff provided a letter from her doctor supporting the need for a caregiver. They discussed the rent amount, and that this amount would be adjusted if Radcliff's income was reduced.

On that date, Radcliff signed the rental agreement (Lease) for a room in an Interfaith apartment. The rent was $142.10 per month. The Lease stated that for tenants in possession less than one year, Interfaith may terminate the Lease "by service upon resident of a written 30-day notice of termination of tenancy." Several other clauses are relevant to the issues on appeal.

First, the Lease contains a "Guests" clause prohibiting guests for "more than 14 consecutive days and nights" and/or a "total combined" visit of more than "30 days in a 365 day period." The clause states: "Failure to comply with . . . the above restrictions may result in eviction."

Second, the Lease contains an integration clause providing: "This Agreement . . . constitutes the entire Agreement between the parties and cannot be modified except in writing and signed by all parties. Neither Owner nor an agent or employee of Owner has made any representations or promises other than those set forth herein."

Third, the Lease contains a "Drugs/Alcohol/Gangs" clause providing, in part: "Resident agrees to keep the premises free of ILLEGAL DRUGS and ALCOHOL during the term of tenancy. Illegal drugs will not be used, stored,

3

manufactured, or kept on the premises by Resident or guests during the term of the Agreement."

Fourth, the Lease contains a "Quiet Enjoyment" clause, stating: "Resident shall not violate any criminal or civil law, ordinance, or statute in the use and occupancy of the premises, commit waste or nuisance, annoy, molest or interfere with any other Resident or neighbor. Any such action may result in the immediate termination of this Agreement."

Fifth, the Lease contains an "Entry" provision stating: "Owner will provide written notice to Resident prior to entry of the dwelling unit whenever required by state law."

In her pleading, Radcliff recited in great detail her version of the events after she signed the Lease. In summary, she alleged she moved into the apartment the same day she signed the Lease, and met her roommate (Roommate) who was living in the other room in the unit. Several days later, Roommate told Radcliff "she was able to get her former roommate . . . 'evicted' by having Interfaith back her in a Restraining Order action." Roommate said she was friends with Interfaith employees and they had testified on her behalf.

Several days later, on July 29, a male neighbor in the program (Neighbor) was visiting Radcliff at her apartment when three Interfaith employees entered the unit through an unlocked screen door, allegedly without Radcliff's consent. Two of the employees were defendants Traci Chester (Interfaith's housing director and a social worker) and Cheryl Paster (Interfaith's residential manager). Chester then allegedly "harass[ed]" Radcliff and Daughter by making "outrageous and malicious accusations that [they] 'snuck into the program'" and that "she had people 'watching them'" This caused Radcliff "substantial shock, anxiety and distress."

4

Two days later, Radcliff complained about this incident to Brown and two of his supervisors: defendants Greg Anglea (Interfaith's executive director) and Filipa Rios (Interfaith's chief program officer).

Several weeks later, on August 21, Radcliff "began to notice various people that [Roommate] called 'friends' coming and going briefly from the unit. [Daughter] overheard [Roommate] talking to one of them about pricing for her 'pills' and saw them leaving the unit shortly after."

The next day, Roommate "started to behave erratically and verbally abus[ed] Radcliff." Fearing for her safety, Radcliff called 911. After reporting Roommate's conduct to the responding police officers, Radcliff and Daughter slept in their car. Radcliff told Interfaith officials she feared for her safety because of Roommate's erratic and verbally abusive conduct.

Brown said he would contact Roommate "to see if she was agreeable to mediation." On that day, Roommate sought a temporary restraining order (TRO) against Radcliff. On information and belief, Radcliff alleged Interfaith knew about this court filing, and about Roommate's previous filings against her former roommates. Later that day, Brown escorted Radcliff back to the apartment and spoke with Roommate, who "apologized for her erratic behavior and promised she would change."

About one week later, Radcliff allegedly told Brown that Roommate "was actively selling her medication from the unit and this was the reason [for] her erratic behavior." Throughout the next week, Roommate's friends resided on the couch and Roommate acted erratically, and "several household items were missing." One of Roommate's friends asked Roommate "if she still had any of her medication left and stated that she needed to take some." Radcliff complained to Brown about Roommate's behavior.

5

Beginning on September 9, Radcliff and Daughter no longer slept at the apartment and instead slept in their car because of Roommate's conduct. Radcliff checked courthouse records and allegedly found Roommate had an "extensive criminal history," and also learned Roommate had filed a restraining order petition against her and the hearing was scheduled for September 11.

Radcliff told Brown about the court petition and asked him to come with her, but Brown declined. Radcliff attended the September 11 hearing, but because of the stress, she left and was rushed to the emergency room where she was hospitalized with hypertension-tachycardia. The court did not issue any form of a restraining order.

The next week, on September 18, Brown presented Radcliff with a three-day notice to pay rent and a 30-day notice to terminate the tenancy. The 30-day notice was based on Radcliff's failure to pay August rent ($142.10) and her claimed violation of two Lease provisions: (1) the Quiet Enjoyment clause; and (2) the Guests clause. On the latter violation, the Notice stated: "Your tenancy is part of the Senior Housing Program. The program specifically prohibits visitors from spending the night on the property for more than 14 consecutive days and not to exceed 30 days in a calendar year. Management has witnessed and/or been advised and has reason to believe that your daughter has been living in your unit since you moved in, on July 20, 2015. On several occasions you have been notified of the guest policy and have not complied."

Radcliff moved from the apartment. She alleged she was concerned about retaliation, and was "forced to forfeit the unit without any money, resources or any other place to reside." Shortly after, Interfaith officials told

her about another housing program for which she was potentially qualified, but they ultimately did not accept her into this program.

With respect to damages, Radcliff alleged that after leaving the unit she and Daughter were homeless for the next year until November 11, 2016, when she was able to obtain a permanent residence.

## B. *Radcliff's Causes of Action*

Radcliff (who was self-represented) initially alleged three contract-based claims (breach of contract, breach of warranty of habitability, and constructive eviction[2]), and several tort claims (negligence, gross negligence, negligence per se, willful misconduct, and negligent and intentional infliction of emotional distress). Radcliff's theory was that she was wrongfully forced to leave her apartment because Roommate sold drugs and Interfaith knew about this conduct; Interfaith managers entered Radcliff's apartment unit on July 29 without her consent; Interfaith assisted Roommate in her efforts to obtain a protective order against Radcliff (which would have required Radcliff to move out); and Roommate's conduct made the apartment unlivable.

Defendants twice demurred, and the court overruled the demurrers on the contract-based claims, but sustained the demurrers without leave to amend on the tort claims, finding those claims were untimely under the two-year statute of limitations.

## C. *Summary Judgment Motion*

Interfaith and the Individual Defendants then moved for summary judgment on the remaining contract-based claims.

Individual Defendants argued they could not be held liable for these claims as a matter of law because they were not parties to the Lease.

---

2    Although a constructive eviction claim is sometimes characterized as a tort, it is derived from the contractual relationship and thus we refer to it as a contract-based claim.

Interfaith argued it was entitled to summary judgment because Radcliff could not prove the material factual allegations in her amended complaint. In support, Interfaith presented numerous items of evidence.

First, Interfaith proffered the declaration of defendant Rios (Interfaith's program manager), stating that during her tenancy Radcliff complained that Roommate had yelled at her, told untruths about her, used her kitchen items, threatened to tow her car, and was erratic, but Radcliff never complained about, and Interfaith was unaware of, Roommate engaging in criminal conduct while Radcliff was living with her. Rios said that both Radcliff and Roommate were accepted to be tenants as part of its program to provide "permanent housing to high risk populations" by offering housing "without preconditions" such as "sobriety, mental health issues or prior criminal histories."

Interfaith also presented the declaration of Paster (Interfaith resident manager), who described her version of the July 29 visit to Radcliff's apartment. She said she and Housing Director Chester (and another staff member) went to Radcliff's unit on that date. When they arrived, the "screen door was closed but unlocked." Chester or Paster "knocked on the door at which time [Neighbor] . . . was in the unit and said to enter. [¶] I understood that we had permission to enter Ms. Radcliff's unit. [¶] Upon entering the unit, Ms. Radcliff was present and greeted us [and] we then began a conversation." An "Incident Report" written by Paster, similarly describing this visit, and also included more details about the parties' conversation.

Interfaith also submitted the deposition testimony of Daughter, who acknowledged: (1) she moved into the unit with Radcliff; (2) she would stay in the unit sometimes (although she would sometimes sleep in her car); and (3) the apartment was in good physical condition when they moved in.

Daughter said the apartment was not in a "livable" condition because "people kept coming in and out of the house for [Roommate]"; the "potential drug deals"; and Roommate's "bipolar behavior."

Interfaith also submitted Radcliff's deposition testimony, in which she acknowledged she never heard or saw Roommate selling drugs and had no physical evidence to support her allegation of illegal drug transactions in the apartment. Radcliff said she nonetheless believed this was occurring because "[s]omeone came in [and] went to [Roommate's] bedroom." She said that "[w]hen I told [Interfaith officials] that I suspected that she sold drugs from the unit, they did absolutely nothing. [Instead] they allowed her to try to get me evicted." Radcliff said the "main" issue in her lawsuit was that Interfaith knew that Roommate was "try[ing] to get me evicted" and yet did nothing about this.

Interfaith also produced a police incident report from August 22 reflecting Radcliff's complaints to police about Roommate's mental health problems and Radcliff's fear of Roommate.

Interfaith also produced numerous emails written by Radcliff to Interfaith officials from August 21 through September 10. In these emails, Radcliff: (1) complained about Chester, including her July 29 visit to Radcliff's apartment; (2) complained about Roommate's "irrational" and "out of control" behavior, concerning such things as having Radcliff's car towed (allegedly resulting from Chester's instructions) and Roommate screaming at her for using her laundry items; (3) sought Interfaith's assistance to mediate her disputes with Roommate; (4) said she could "not live like this" because Roommate was "too unpredictable" and that someone was sleeping on the couch who she did not know; and (5) acknowledged that Brown was seeking to help mediate the roommate disputes.

9

On September 4, Radcliff wrote to Brown and Rios stating: "[Roommate's] behavior again, has become erratic. She has thrown out things and has taken things that belong to me. I haven't said anything to her, because I don't want things to get out of control. I think the sooner I leave here the better."

Four days later, a police report stated Radcliff reported she needed assistance to return to her apartment to "pick up items so she could move out of her apartment due to a disturbance with" Roommate.

Two days later, Radcliff and Brown had an email exchange about the hearing on Roommate's restraining order petition scheduled for the next day. Radcliff reminded Brown of the hearing, and said "I wanted to let you know that I think I will be able to speak on my own behalf, so you will not need to appear with me tomorrow. I think I have this covered." Brown responded he had not intended to appear because he had no personal knowledge of the events, and expressed hope the roommates "can settle [their] differences in an amicable manner."

Shortly after, Radcliff responded:

> "I think you've missed the point. [Roommate] has come after me . . . just like she did her former roommate. She is using Interfaith and the court system to try to inject her venom and hurt people. How long is Interfaith going to let her continue unchecked? [¶] You were a witness to her remorse and her behavior when I met you at the unit on August 25, 2015, the day after she filed the Restraining Order [petition] against me. Do you really think you can mediate what she is trying to do to me? I welcome it. [¶] I am an American citizen and I have certain rights, one to live peacefully in my home."

Based on all of its proffered evidence, Interfaith argued the constructive eviction claim had no merit because Radcliff moved out of the unit after she was served with the three-day and 30-day notices. On the

10

breach of warranty of habitability claim, Interfaith argued this claim fails because it was undisputed the unit was in good physical condition. On the breach of contract claim, Interfaith argued Radcliff could not prevail because Interfaith did not breach the lease, and she was not in compliance with the lease terms (by failing to pay August rent and having Daughter live with her). It also argued the claimed breach (the July 29 entry into her apartment) was not actionable because Chester and Paster reasonably believed they had permission to enter.

Interfaith further argued that even if Roommate had mental health issues and a criminal history, this was not sufficient to establish Radcliff's legal claims, emphasizing there was "no evidence of any criminal activity by [Roommate] in the unit during the tenancy or any act or omission by Interfaith which rendered the unit unfit for occupancy."

D. *Radcliff's Opposition to Summary Judgment*

In opposition, Radcliff argued she had put Interfaith on notice she was having substantial problems with Roommate, and Interfaith management officials had "in essence, ratified" Roommate's actions. She argued defendants "conspired with [Roommate] to get [her] to abandon her leasehold," including by assisting Roommate to obtain a "false restraining order." She also argued she believed she was targeted for eviction in retaliation for her letter complaining about Chester. Radcliff further asserted she did not know she would be living with a "multiple felon" or that Interfaith's housing was for "high risk" populations.

In support she presented several items of evidence, but did not submit any declarations authenticating the evidence.

Included in this evidence were several emails between herself and Interfaith officials during her tenancy, many of which had already been

11

produced by Interfaith. One additional email was an August 24 email from Brown to executive director Anglea stating:

> "Radcliff is going to see you again today. She is having problems with [Roommate]. The Problems, I am told range from not being able to use the pots and pans to a dispute with the parking spots. [Radcliff] told me that she called the police this weekend because [Roommate] was acting erratically. [Roommate] apparently took all the pots and pans and locked them in her room. I have offered to have a mediation between the two of them and am in the process of setting that up. [Daughter] is reported to be staying on the property. [Roommate] reported to me in confidence that she is filing a restraining order today against [Radcliff], she asked me not to tell [Radcliff], and I reassured her that I will not. [Radcliff] has not paid her rent for the month of August . . . ."

Radcliff also submitted two of her additional emails to Brown that day complaining she did not feel safe with Roommate and that Roommate would not agree to mediation. She stated: "I do realize that I need to have the police escort me onto the property and not you, as we discussed earlier today."

She also submitted a letter or email she wrote containing a "formal complaint" about Chester's July 29 "unannounced and unauthorized onsite visit," and claiming Chester's statements to her were "intimidating," "insulting and demeaning."

Radcliff also submitted court documents showing Roommate had sought a restraining order against her on August 24. She additionally proffered a document appearing to show that Roommate had been arrested on June 14, 2018 for identity theft crimes.

### E. *Summary Judgment Reply*

In reply, defendants argued Radcliff's failure to file a response to their undisputed statement of material facts waived her right to oppose the motion. Defendants also objected to Radcliff's evidence, arguing each

document lacked authentication, lacked foundation, contained inadmissible hearsay, and was not relevant.

## F. *Court's Order*

After considering the briefs and record, the court granted the summary judgment motion. The court noted that Radcliff did not file an opposition to defendants' separate statement, but said it would "exercise its discretion [to] consider the merits of the motion." The court then sustained defendants' evidentiary objections to each of Radcliff's proffered documents, stating they "have not been authenticated."

On the constructive eviction claim, the court found Radcliff "failed to establish a triable issue of material fact" because "the evidence shows [she] vacated the rental unit after Interfaith issued a 30-Day termination notice."

On the warranty of habitability claim, the court found Radcliff did not "establish a triable issue of material fact that a material defective condition affected the premises' habitability" and/or that Interfaith had notice of this condition.

On the breach of contract claim, the court stated: "Plaintiff has failed to establish a triable issue of material fact that she did all, or substantially all, of the significant things the lease required her to do" and/or "that Interfaith failed to do something that the lease required it to do."

The court additionally found it was undisputed the Individual Defendants "were not parties to the [L]ease," and "Plaintiff has failed to establish a triable issue of material fact that the [I]ndividual [D]efendants are personally liable as agents or employees of Interfaith."

## DISCUSSION

### I. *Appellate Standards*

It is a fundamental rule of appellate law that the lower court's judgment is presumed to be correct. (*Jameson v. Desta* (2018) 5 Cal.5th 594, 608-609.) It is the appellant's burden to overcome this presumption and show prejudicial error. (*Ibid.*)

To satisfy this burden, an appellant's briefs must summarize the relevant facts and provide supporting citations to the factual record and relevant legal authority. (See Cal. Rules of Court, rule 8.204(a)(2)(C), (a)(1)(B).) The party must describe only relevant and admissible evidence, and must present reasoned argument on each asserted point under a separate heading. (See *Tellez v. Rich Voss Trucking, Inc* (2015) 240 Cal.App.4th 1052,1066; *Opdyk v. California Horse Racing Bd.* (1995) 34 Cal.App.4th 1826, 1830, fn. 4.)

Defendants note that Radcliff did not comply with these briefing rules, and urge us to "affirm the judgment on this ground alone." We decline to do so. Radcliff designated a complete record for review and her appellate arguments are comprehensible and in substantially proper form. We shall consider the issues on their merits in the interests of justice.

However, our review is necessarily limited to the specific contentions raised by Radcliff in her appellate briefs and is based solely on the evidence we may properly consider on the summary judgment (See *Frittelli, Inc. v. 350 North Canon Drive, LP* (2011) 202 Cal.App.4th 35, 41; *Cahill v. San Diego Gas & Electric Co.* (2011) 194 Cal.App.4th 939, 956.) We disregard legal arguments and factual assertions to the extent they are based on evidence not before the trial court in the summary judgment proceedings or for which the court properly sustained evidentiary objections. Generally, a

14

failure to challenge a court's evidentiary rulings on appeal forfeits a claim of evidentiary error. (*Arnold v. Dignity Health* (2020) 53 Cal.App.5th 412, 420.)

## II. *Summary Judgment Standards*

Summary judgment is proper if "all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (Code Civ. Proc., § 437c, subd. (c).)

A defendant moving for summary judgment "bears the burden of persuasion that there is no triable issue of material fact and that [the defendant] is entitled to judgment as a matter of law." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850 (*Aguilar*).) To meet this burden, the defendant must show one or more elements of the cause of action cannot be established, or that there is a complete defense to that cause of action. (*Ibid*.)

Once the defendant satisfies its summary judgment burden, " 'the burden shifts to the plaintiff . . . to show that a triable issue of one or more material facts exists as to that cause of action or a defense thereto.' " (*Aguilar*, *supra*, 25 Cal.4th at p. 849.) To meet this burden, the plaintiff must present admissible evidence showing a triable issue of fact, and may not rely upon the allegations in her pleadings. (Code Civ. Proc., § 437c, subd. (p)(2).)

We review a summary judgment de novo. (*Buss v. Superior Court* (1997) 16 Cal.4th 35, 60; *State of California v. Continental Ins. Co.* (2017) 15 Cal.App.5th 1017, 1031.) We independently evaluate the motion, and do not defer to the trial court's conclusions or reasoning. We strictly scrutinize the moving party's papers and resolve doubts in the opposing party's favor. (*Hampton v. County of San Diego* (2015) 62 Cal.4th 340, 347.)

## III. *Liability of Individual Defendants*

The trial court found the undisputed facts showed the Individual Defendants could not be held liable because they were not parties to the

Lease or any other contract with Radcliff. This ruling was correct. (See *Stoiber v. Honeychuck* (1980) 101 Cal.App.3d 903, 928-930; see also *Kurtin v. Elieff* (2013) 215 Cal.App.4th 455, 480.) Moreover, Radcliff forfeited any challenge to this conclusion because she has not contested the court's ruling in her appellate briefs. (*Christoff v. Union Pacific Railroad Co.* (2005) 134 Cal.App.4th 118, 125.)

### IV. *Constructive Eviction Cause of Action*

In her first cause of action, Radcliff alleged constructive eviction based on interference with her quiet enjoyment of the apartment unit.

### A. *Legal Principles*

Every lease contains an implied covenant of quiet enjoyment. Under this covenant, the landlord promises to allow the tenant quiet enjoyment of the premises and not to disturb the tenant's possession and beneficial enjoyment of the premises for the purposes contemplated by the rental agreement. (*Erlach v. Sierra Asset Servicing, LLC* (2014) 226 Cal.App.4th 1281, 1299-1300 (*Erlach*).) To be actionable, the breach of the covenant must be substantial. (*Andrews v. Mobile Aire Estates* (2005) 125 Cal.App.4th 578, 589-590 (*Andrews*).) Further, the interference must be by the landlord, its agents, or, under certain circumstances, individuals for which the landlord had a duty and ability to control. (See *id.* at p. 590; see also *Nativi v. Deutsche Bank National Trust Co.* (2014) 223 Cal.App.4th 261, 291-292.)

If the landlord breaches the covenant, the tenant can leave within a reasonable time and recover on a constructive eviction claim or may remain in possession and sue for damages. (*Andrews, supra,* 125 Cal.App.4th at p. 590; see *Nativi, supra,* 223 Cal.App.4th at p. 292; *Guntert v. City of Stockton* (1976) 55 Cal.App.3d 131, 141.)

16

## B. *Analysis*

In her complaint, Radcliff alleged Interfaith breached the covenant of quiet enjoyment based on three sets of allegations: (1) Interfaith "fail[ed] to respond and resolve [Roommate's] drug dealing activities at the unit"; (2) Interfaith "had knowledge of [Roommate's] criminal history and aided her to abuse the legal system by filing a [petition for a] restraining order against [Radcliff] and [other former] roommates"; and (3) Chester and Paster "enter[ed] the [leased unit] without notice knowing plaintiff suffered from post-traumatic stress disorder, major depressive disorder, and acute anxiety disorder."

The undisputed facts in the summary judgment record establish Radcliff cannot recover on her constructive eviction claim based on any of these theories.

First, there was no evidence Roommate engaged in illegal drug dealing activities at the residence. Interfaith submitted a declaration of its chief program officer (Rios), who stated Interfaith was unaware Roommate engaged in any criminal conduct during Radcliff's tenancy. Interfaith also presented Radcliff's deposition testimony in which she acknowledged she never heard or saw a drug sale or transaction in the apartment.

In responding to defendants' summary judgment motion, Radcliff did not present any affirmative evidence that Roommate had engaged in illegal drug activity. In her appellate brief she cites to various pages of the appellate record to support her assertion that she informed Interfaith of Roommate's "drug activity." We have reviewed these pages, and find no support for Radcliff's claim that Roommate was engaged in illegal drug activity. Thus, even assuming Interfaith had a duty to take action when it was aware a tenant in one of its shared units was engaged in illegal drug

17

activity, this claim fails because there was no evidence to support that this activity was taking place.

Second, with respect to Interfaith's knowledge of Roommate's criminal history, there is no admissible evidence of this history or that Interfaith knew about this history. Radcliff proffered a document purporting to show Roommate's arrest for identity theft, but this arrest occurred long after Radcliff's tenancy ended. Moreover, the court sustained defendants' hearsay and lack-of-foundation objections to this document, and Radcliff has not challenged this ruling on appeal. Additionally, even if true, there is nothing in the record establishing the fact that Roommate had a criminal history that interfered with Radcliff's use or enjoyment of the property. There was no evidence that Roommate was engaged in any illegal activities while Radcliff lived with her.

Third, as to the restraining order petitions, there is no showing Interfaith assisted or was in any way involved in Roommate's unsuccessful attempts to obtain court orders against Radcliff. To the contrary, the undisputed evidence showed Interfaith (through Brown's efforts) attempted to mediate the disputes between Radcliff and Roommate, and Brown made clear he would not attend the hearing as he had no personal knowledge of the relevant facts. Radcliff relies on the evidence that Brown was aware Roommate planned to seek a TRO, and did not initially disclose this to Radcliff. However, there is no showing that he (or any other Interfaith officials) had a duty to disclose this information or had any ability to prevent the filing of a judicial petition. Further, there is no admissible evidence showing Interfaith had any involvement in Roommate's court petitions against prior roommates. Radcliff's claim that Interfaith supported or assisted Roommate in seeking to obtain a protective order against her is

18

based on speculation, which is an insufficient basis to create a triable issue of fact. (*Sinai Memorial Chapel v. Dudler* (1991) 231 Cal.App.3d 190, 196.)

Fourth, the alleged unauthorized entry into Radcliff's apartment by Chester and Paster does not support a constructive eviction claim. To be actionable as a breach of quiet enjoyment, the landlord's act or omission must be serious and "substantially interfere" with the tenant's right to use and enjoy the premises. (*Andrews, supra,* 125 Cal.App.4th at p. 589.) This standard was not met here. The evidence supports that Radcliff was upset after this visit and she repeatedly complained about Chester's conduct. But there is no evidence showing this visit (which was never repeated) rendered the premises unfit for Radcliff to live at the apartment or substantially affected her future enjoyment of the premises.

Radcliff's reliance on *Groh v. Kover's Bull Pen, Inc.* (1963) 221 Cal.App.2d 611 is misplaced. In that case, the commercial tenant could not use the leased premises for its core purpose because the roof continually leaked, causing "hazardous and dangerous conditions to employees and patrons." (*Id.* at p. 613.) Paster and Chester's single claimed unauthorized visit did not similarly undermine Radcliff's use of her property. Moreover, Radcliff did not leave the apartment for about six weeks after this visit, and when she did leave she never said or suggested the reason she was leaving was Chester's unauthorized entry.

V. *Warranty of Habitability Cause of Action*

A tenant can recover damages against a landlord by showing the landlord breached the implied warranty of habitability. (*Erlach, supra,* 226 Cal.App.4th at p. 1297.) Under the implied warranty, "a residential landlord covenants that premises . . . lease[d] for living quarters will be maintained in a habitable state for the duration of the lease." (*Green v. Superior Court*

19

(1974) 10 Cal.3d 616, 637; see *Peterson v. Superior Court* (1995) 10 Cal.4th 1185, 1204 (*Peterson*).)

This implied warranty "gives a tenant a reasonable expectation that the landlord has inspected the rental dwelling and corrected any defects disclosed by that inspection that would render the dwelling uninhabitable. The tenant further reasonably can expect that the landlord will maintain the property in a habitable condition by repairing promptly any conditions, of which the landlord has actual or constructive notice, that arise during the tenancy and render the dwelling uninhabitable." (*Peterson, supra,* 10 Cal.4th at p. 1205.)

Radcliff alleged Interfaith breached the warranty of habitability by "fail[ing] to disclose [Roommate's] possible criminal background prior to moving in" and failing to "curb[ ]" Roommate's "criminal acts and dangerous behavior." However, as described above, this warranty concerns only a property's physical condition. (See *Penner v. Falk* (1984) 153 Cal.App.3d 858, 868 (*Penner*).) The undisputed evidence (Daughter's deposition testimony) shows the apartment was in good physical condition without any defects.

Radcliff has not cited, nor has our independent research disclosed, any authority supporting an extension of this warranty to impose a duty on landlords with respect to issues unrelated to the physical condition of the property, such as another tenant's unlawful conduct. And at least one court has declined to extend the warranty in this situation, finding plaintiffs' complaints about tenants and nontenants who use a public housing project's common areas to buy and sell drugs did not allege a breach of the implied warranty of habitability. (See *Doe v. New Bedford Housing Authority* (1994) 417 Mass. 273, 630 N.E.2d 248; see also *Penner, supra,* 153 Cal.App.3d at pp. 868-869.) In any event, even if the warranty applied to nonphysical matters,

20

there was no evidence that Roommate was engaging in criminal activity that would have made the apartment unfit.

## VI. *Breach of Contract Cause of Action*

A plaintiff establishes a breach of contract claim by showing the defendant violated an express or implied contract provision.  But to recover on a breach of contract claim, the plaintiff cannot be in default.  " 'It is elementary a plaintiff suing for breach of contract must prove it has performed all conditions on its part or that it was excused from performance. [Citation.]' " (*Plotnik v. Meihaus* (2012) 208 Cal.App.4th 1590, 1602; see *Spinks v. Equity Residential Briarwood Apartments* (2009) 171 Cal.App.4th 1004, 1031.)  Thus, " '[o]ne who himself breaches a contract cannot recover for a subsequent breach by the other party.' " (*Plotnik,* at p. 1603; *Silver v. Bank of America, N.T. & S.A.* (1941) 47 Cal.App.2d 639, 645.)

In this case, Radcliff alleged Interfaith breached the Lease (1) when "Chester and Paster intentionally entered [Radcliff's] apartment" on July 29, "without proper notice"; and (2) by failing to adjust her rent based on her reduced income amount.

As to the first ground, even assuming the evidence supported that Chester and Paster entered Radcliff's unit without her consent and this action violated the express terms of the Lease, the action does not support a breach of contract claim because Radcliff was in material violation of the Lease by having Daughter move in with her and by having her stay with her throughout her tenancy.

As to the second ground, there is no evidence Radcliff notified Interfaith of her claimed income change.  Thus, Interfaith did not breach the Lease agreement by failing to lower the rent to reflect her claimed changed income.

21

DISPOSITION

Judgment affirmed.  In the interests of justice, the parties to bear their own costs on appeal.

HALLER, Acting P. J.

WE CONCUR:


AARON, J.


GUERRERO, J.